2012 Ark. App. 373

**Terri METZ, Appellant**

v.

**Thomas Edward STEELE, Appellee.**

**No. CA 11–942.**

Court of Appeals of Arkansas.

May 30, 2012.

Bruce R. Wilson, Woolsey & Wilson, Clarksville, for Appellant.

Roy Gean, III, Gean, Gean, & Gean, Fort Smith, for Appellee.

RAYMOND R. ABRAMSON, Judge.

In this child-custody case, appellant Terri Metz argues that the trial court erred (1) in finding that appellee proved a material change in circumstances demonstrating that a modification of custody was in the best interest of the child and (2) in denying appellant's petition for permission to remove the child. We reverse and remand.

Metz and appellee Thomas Steele had a son, E.S., born out of wedlock on June 25, 2003.[1] An order establishing paternity was entered in May 2004. The order placed custody with Metz and set support payments and visitation; however, the parties continued to live together until February 2009. In July 2009, Metz filed a petition for permission to remove E.S. from the state, alleging that a "material change in circumstances has occurred that require[s] the Plaintiff to relocate to York Town, Virginia." Appellant filed a second petition in August 2009, this time explaining that she had no ties with Arkansas and wanted to move to Virginia to be near her daughter, who was in the military. Appellant stated that her daughter would provide housing and other benefits and could assist her in the event her Crohn's disease flared up. Appellee responded in opposition to the petition.

On October 1, 2009, appellee filed a petition for change of custody. He alleged that he had exercised all visitation allowed under the previous order, plus had been allowed additional visitation; that appellant had been spending the night with an undisclosed romantic partner in the presence of the minor child; and that appellant had arbitrarily stopped his four-day-a-week visitation. Appellant answered, denying all allegations. In a second amended petition for change of custody, appellee included allegations that appellant received Social Security disability benefits and did not file a tax return, and that he should be allowed to claim the parties' minor child as a dependent for income-tax purposes. The minor child was appointed an attorney ad litem in May 2010.

Appellee filed a third amended petition for change of custody in June 2010. In this petition, he alleged that the minor child had reported being dressed as a girl and given girls' toys to play with; that the school counselor had made a referral; and that the child was in counseling and appellee wished to be included in the counseling.

A hearing on the petitions was held on November 30 and December 7, 2010. E.S.'s counselor testified that she was not initially his counselor, but she testified regarding the master treatment plan and diagnostic assessments done at the initial interview. The presenting-problem survey noted "anger/aggression" and "anxiety/panic/phobia." She believed that the mother stated that the presenting problems were obsessions and occasional opposition, mostly since returning from visits with the father. It was also noted that E.S. liked to play dress-up. The Global Assessment Process (GAP) score of 81 to 90 reflected a "pretty well functioning person." The initial intake GAP score of 60 was on the higher end of functioning—

---

1. Metz also has another son and an adult daughter.

typically not needing counseling. On cross-examination, the counselor stated that she saw the child three times and discharged him in October 2010 because all goals had been met and there were no additional services needed. E.S. was well adjusted, and his only need was not to be involved with parental conflicts.

Appellant testified next. She stated that after appellee moved out of their home in February 2009, he saw E.S. "whenever he wanted but there was not an exact schedule." She stated that she filed the petition to remove the child because she had no ties to Arkansas and had moved here only to be with appellee. She testified that her twenty-six-year-old daughter had adequate housing for her and E.S. (a two-bedroom apartment); that they would share housing expenses, and her daughter would assist when she had flare-ups of Crohn's disease; and that certain benefits would be available to her if she lived in the home with her daughter—including medical insurance, college tuition, and military discounts on housing and air fare. At the time of the hearing, appellant was covered by Medicaid and E.S. was covered under Arkids and insurance from appellee. Appellant testified that she was hospitalized for her Crohn's disease on several occasions in 2005, in January, March, April, and October 2006, and on July 19, 2007. She was hospitalized again in July 2008. Appellant's Crohn's disease prevented her from doing many everyday activities, including working, but she was able to make it to most of E.S.'s school functions and extracurricular activities. Appellant stated that she did not have a boyfriend. She first testified that she had never used marijuana, cocaine, or methamphetamine, but upon questioning from the court, appellant testified that she had tried marijuana in middle school but had not used drugs since.

Appellant testified that since she posted on Facebook in February 2009 that she and her boys would be moving to Virginia, she had done some research. She stated that E.S. would go to the York Town School District, which she had not visited but had been recommended to her by friends. She did not know whether the children would go to school all year, but she claimed to have looked up "the population, crime rate and scholastics." Appellant went on to testify that appellee was not listed as an emergency contact for E.S. because he would not answer the call or get the message; she instead listed friends. She stated that she had told E.S. that he would still get to see his dad. She did not know the mileage or how many hours it took to get to her proposed new home in Virginia.

As for her finances, appellant stated that her expenses exceeded her income. She did not pay taxes; she was able to keep her disability payments and receive up to $900 a month. She denied having ever picked E.S. up by the hair or cursing him, or telling him that he could not make a birthday card for his father. When she was gone to Chicago for over a month for testing and surgery, appellee kept both of appellant's children, although they spent the night with babysitters because he had to be at work early. Appellant stated that appellee was fired from his job in 1996 for using drugs. While she had worked two jobs when she was first pregnant because appellee had been laid off, he otherwise worked outside the home while the parties were together. Appellant had not worked outside the home since 2005, when she began receiving Social Security disability benefits. Appellant stated that she did not have a problem with appellee's new wife, although she did have a problem with Ms. Steele interrupting or stating her opinion when she and appellee were discussing E.S. Appellant stated that appel-

lee's trailer was not big enough for his wife and two kids and E.S. As for the counseling sessions, appellant stated that she requested that E.S. see the school counselor due to difficulties at visitation times and problems at school. She remembered telling the counselors that appellee was concerned about him being "a little more feminine" but denied wanting a girl or having primarily girls' toys in his room. Appellant believed that appellee blew out of proportion the fact that E.S. played with a few feminine toys. After E.S. expressed to her that his father was "giving him a lot of grief" about the girls' toys, appellant talked with E.S. and they decided that he was too big for those toys and that he should start second grade "fresh." They threw out the girls' toys together.

Michelle Farris testified that appellee moved in with her and her husband when the parties broke up. She testified to appellee being an involved father; seeing appellant smoke marijuana and do "coke" on one occasion in 2008; and witnessing appellant pick E.S. up by his hair one time in 2007.

Gregory Mostecky testified that he had known appellee for about twenty-five years and met appellant through him. Before Mostecky was diagnosed with lung cancer four and a half years earlier, he and the parties did methamphetamine together on several occasions. He had not seen any drug use by the parties since their separation.

Appellee Thomas Steele testified regarding his life with appellant and his visitation after their split. He stated that they agreed that he would have E.S. on Tuesdays and Thursdays for two to three hours and all day Saturday through Sunday evenings. After he and his current wife moved in together, appellant told him that he would have to go back to the court-ordered visitation of every other weekend.

Appellee admitted past drug use (using methamphetamine as recently as twenty-two months prior) but stated that he had passed all random drug screens he took at work for the past several years. He denied ever threatening appellant's older son. He discussed his concerns about E.S. playing with girls' toys. Appellee also stated that appellant was a good mother, and he had no problems with the way she cared for E.S. He did not want E.S. to move to Virginia because he would not be able to see E.S. as much.

E.S.'s school principal and several of appellant's friends (including appellee's sister) testified that E.S. was a well-adjusted little boy and appellant was a good mother. Appellant's ex-husband testified that appellant used drugs when they were together.

Finally, the attorney ad litem recommended that custody remain with appellant and that her petition to relocate be denied "because ... nothing has been shown why it would be in the best interest of this child to take him and relocate him in Virginia where it would not be in his best interest to be separated from his father."

The judge ruled in a letter order that appellant's request to remove the child to another state was denied. The court found that the proposed move was "primarily for the benefit of the mother without regard for the child's best interest," citing appellant's stated desire for a "fresh start" and inability to provide credible details regarding the available schools. The court also cited "inconsistencies" and "lies" in appellant's testimony, such as her statement that she had not used drugs at any time since middle school despite testimony from appellee otherwise. Further, the court stated that appellant had a history of inconsistency with regard to visitation, allowing liberal visitation until

unilaterally altering the parties' agreement to the detriment of the child. As for appellee's petition to change custody, the court found both the required material change in circumstances and that it was in the best interest of the child. The material change of circumstances found by the trial court was that the mother fostered a relationship between father and son until the parties separated and she "stopped that relationship for no good reason other than her perceived authority to do so." An order was entered on June 22, 2011, and appellant filed a notice of appeal on July 1, 2011.

### I. *Change of Custody*

This court has set forth the standard of review in child-custody modifications as follows:

> The standard of appellate review governing custody modifications is well settled. In child-custody cases, the primary consideration is the welfare and best interests of the child involved; all other considerations are secondary. Custody will not be modified unless it is shown that there are changed conditions demonstrating that a modification is in the best interest of the child. In cases involving child custody and related matters, we review the case de novo, but we will not reverse a trial judge's findings in this regard unless they are clearly erroneous. Although there is evidence to support it, a finding is clearly erroneous when the reviewing court is left with the definite and firm conviction that a mistake has been made. Because the question of whether the trial court's findings are clearly erroneous turns largely on the credibility of the witnesses, we give special deference to the superior position of the trial judge to evaluate the witnesses, their testimony, and the child's best interests.

*Walker v. Torres,* 83 Ark.App. 135, 137–38, 118 S.W.3d 148, 150 (2003) (citations omitted).

■ ₈Here, we must determine whether the trial court's finding of changed circumstances demonstrating that a modification is in the best interest of the child is clearly erroneous. According to appellant, appellee's proof of a material change of circumstances centered on appellant's alleged drug use and concern over E.S. playing with girls' toys. However, the court did not explicitly find that appellant's drug use or the issue of E.S. playing with girls' toys constituted a material change. Instead, the court found in its letter order that appellee had proved a material change in circumstances in that appellant fostered a relationship between father and son until the parties separated and she "stopped that relationship for no good reason other than her perceived authority to do so." Nonetheless, appellant argues that her alleged drug use is not a material change in circumstances warranting a change in custody, and we agree. The court found that appellant's "denial of use of drugs any time subsequent to middle school flies in the face of reason and is inconsistent with the credible testimony of the father to the contrary." The only evidence of drug use by appellant indicated that it was in the past and that appellee had also used drugs. According to appellant, the other proof of material change was the concern over E.S. playing with girls' toys. According to E.S.'s counselor, this was not an issue, and appellee himself testified that he had no concern about appellant's parenting skills.

For a change of custody, the trial judge must first determine that a material change in circumstances has occurred since the last order of custody. When the petition to change custody was filed, the parties were undisputedly following the court's paternity/custody order, which set

visitation. We do not believe that following the visitation schedule previously ordered by the court constituted a material change in circumstances. Because the court erred in finding that a material change in circumstances occurred, we reverse the change of custody without reaching the best-interest issue.

## II. *Relocation*

The factors a trial court must consider when determining whether to grant a petition to relocate were set out in *Hollandsworth v. Knyzewski*, 353 Ark. 470, 109 S.W.3d 653 (2003). These factors include (1) the reason for relocating; (2) the educational, health, and leisure opportunities available in the new location; (3) the effect of the move on the visitation and communication schedule of the noncustodial parent; (4) the effect of the move on extended-family relationships in Arkansas and the new location; and (5) the children's preferences, considering the ages and maturity level of the children and the reasons given for the preference. *Hollandsworth*, 353 Ark. at 485, 109 S.W.3d at 663–64. Even when these factors are considered, the polestar remains whether it has been established by a preponderance of the evidence that a proposed relocation would serve the child's best interest. *Sill v. Sill*, 94 Ark.App. 211, 228 S.W.3d 538 (2006). A presumption exists in favor of relocation for custodial parents with primary custody, with the burden being on a noncustodial parent to rebut the presumption. *Id.* Therefore, a custodial parent is not required to prove a real advantage to herself or himself and to the children in relocating. *Id.*

Here, the trial court did not specifically address the above factors or the presumption in favor of relocation. The only finding that the court made was that appellant was thinking of giving herself a "fresh start" and was not thinking of her child in making the decision to move. Thus, it appears that the trial court shifted the burden of proof to the custodial parent, which constitutes reversible error. *See Hartsell v. Weatherford*, 2012 Ark. App. 164, 2012 WL 559951. Reversed and remanded for further proceedings consistent with this opinion.

HART, GRUBER, GLOVER, and BROWN, JJ., agree.

PITTMAN, J., dissents.

PITTMAN, J., dissenting.

I would affirm the trial court's decision granting custody to appellee father. Although the best interest of the child could be perceived more clearly by the trial judge, who had the opportunity to view the parties as they testified and assess their credibility, there was significant evidence that the mother exhibited immature and erratic behaviors that were detrimental to the child and required treatment by a psychologist. There was also evidence that the mother had anger-control issues and that, on one occasion, she was seen screaming at the child while pulling him up by his hair. Given the strength of the trial judge's findings regarding appellant's lack of credibility, I would affirm the trial court's finding regarding the child's best interest.

More troubling to me, however, is the majority's holding that appellee failed to prove that there was a material change of circumstances warranting an inquiry into custody of the child. The typical custody dispute involving an illegitimate child has the parents residing in separate households, with the mother performing the lion's share of the day-to-day tasks related to raising the child while the father is substantially less involved and more distant from the child in terms of both time

and space. In this case, however, it is undisputed that, although the child was born out of wedlock, the appellee established paternity and lived with the mother and child from the time of the child's birth in 2003 until shortly before the court proceedings commenced in 2009. Although unmarried, the parties and the child formed a *de facto* family unit that was disrupted by the separation of the parties and appellant's subsequent refusal to allow appellee to visit the child. While I deplore the decline of marriage as an institution, the functional framework for the raising of children provided by marriage was present in this case to such a degree that I see no practical difference, from the child's perspective, between the breakup of a functioning family unit by a *de facto* separation as opposed to rupture of the family unit by legal separation or divorce. In a society where fathers are increasingly remote or altogether absent, it is a mistake to afford such little weight to the sustained efforts of the biological father in this case to fulfill his paternal obligations.

I respectfully dissent.